Filed 8/11/26  P. v. Valentin CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B343054 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA511991) |
| v. | |
| ZAMIR VALENTIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan Kline and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Zamir Valentin (defendant) was convicted of second degree murder of his girlfriend, Shaenate M.,[1] after he shot and killed her during an argument. Defendant contends the trial court improperly instructed the jury regarding implied malice using CALJIC No. 8.11 and failed to sua sponte instruct the jury on involuntary manslaughter as a lesser included offense of second degree murder. He alleges his trial counsel provided ineffective assistance by failing to object to the prosecutor's closing argument regarding heat of passion and the cooling period, and by failing to contest the court's hearsay ruling surrounding a statement he made immediately following the shooting. He avers the cumulative effect of each of these errors was prejudicial. Finally, he asserts the trial court abused its discretion in failing to strike the firearm use enhancement under Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81). We are not persuaded and affirm the judgment.

## BACKGROUND

### I. Procedural history

Defendant was charged by information with one count of murder (Pen. Code,[2] § 187, subd. (a); count 1). The information further alleged defendant personally used a firearm during the commission of the offense, within the meaning of section 12022.5, subdivision (a). The People also alleged the following

---

[1]	During trial, the court granted the People's request to strike Shaenate's last name from the record.

[2]	Unless otherwise designated, all further statutory references are to the Penal Code.

2

aggravating factors pursuant to the California Rules of Court:[3] (1) defendant "has suffered prior convictions … that are numerous and of increasing seriousness" within the meaning of rule 4.421(b)(2); (2) defendant "was armed with and used a weapon" during the commission of the offense within the meaning of rule 4.421(a)(2); and (3) the offense "involved great violence, great bodily harm, threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness" as set forth in rule 4.421(a)(1).

Following a jury trial, defendant was found guilty of second degree murder, and the jury found the allegation of personal use of a firearm to be true.

Defendant waived his right to a jury trial on the aggravating factors. Citing mitigating circumstances pursuant to section 1385, subdivision (c)(2)(D) and (E) and no concerns for public safety, defense counsel asked the court to dismiss the firearm enhancement. Alternatively, counsel asked the court to impose the low term for the enhancement. The People filed a sentencing brief requesting the court sentence defendant to the maximum of 25 years to life.

At sentencing, the court noted it had read and considered defense counsel's motion to dismiss and the People's sentencing brief and entertained oral argument from the parties. The court denied defendant's motion and sentenced defendant to 15 years to life in count 1 and the midterm of four years for the firearm enhancement.

Defendant timely filed his notice of appeal.

---

[3]     Unless otherwise designated, all further court rule references are to the California Rules of Court.

## II.    Statement of facts

### A.    *Background*

Defendant and Aaron L.[4] had known each other for about two years and were best friends; both were unhoused and "move[d] around together."  Aaron looked up to defendant, whom he called "Detroit" and considered a brother.  In January 2023, defendant, his girlfriend Shaenate, Aaron, and Aaron's girlfriend Harmonnie were staying at the Metro Plaza Hotel in Los Angeles.

### B.    *Relationship between defendant and Shaenate*

Aaron had personally witnessed Shaenate and defendant argue many times before January 5, 2023, and described Shaenate as consistently the aggressor.  She was violent toward defendant, cursed at and insulted him, and repeatedly accused him of stealing money or infidelity.  Aaron had seen Shaenate punch and beat defendant many times.  Whenever defendant and Aaron were together, defendant would try to get away from Shaenate, but she would always "track him down."

About three or four months before January 5, Aaron witnessed Shaenate pour gasoline over defendant's tent and set it on fire.  Afterward, Shaenate "grab[bed a] skateboard from the tent as she grab[bed] an electric scooter from the ashes of the burnt tent."  Aaron also saw Shaenate steal defendant's parked scooter on another occasion and believed Shaenate stole defendant's Social Security check, causing defendant to cry that "$1,000 was gone."

---

[4]    Aaron L. was 15 years old at the time of these events and 16 at the time he testified at defendant's trial.  Accordingly, we refer to him by his first name only.

On December 26, 2022,[5] Los Angeles Police Department (LAPD) Officer Chris Paek was on foot patrol at the Metro Station on 7th and Figueroa Streets when his attention was brought to an altercation between a man and a woman.[6] When Officer Paek arrived, Sergeant Miller had already detained defendant; Miller stated the man had been seen pushing a woman around. Officer Paek photographed a scratch on the right side of defendant's nose and a red mark on his neck. Meanwhile, a woman, later identified as Shaenate, was yelling and acting aggressively toward defendant. Officer Paek spoke to Shaenate and found she was carrying mace, which Officer Paek seized. In that incident, Shaenate was deemed the "dominant aggressor" and was listed as the suspect. Jaheem Brown, apparently defendant's alias, was listed as the victim. The report notes the two had been dating for a year and a half.

C. *Events of January 5, 2023*

On January 5, 2023, at approximately 9:45 p.m., defendant, Aaron, Harmonnie, and Shaenate returned to their room at the Metro Plaza Hotel. The group arrived together but, Shaenate was still outside the room, and, as a result, she kicked the door to the room. Defendant let her in. When defendant first entered the hotel room that evening, Aaron saw him take a .40-caliber semiautomatic gun out of his backpack and place it on the

---

[5]     At trial Aaron testified that about four months before the murder, he saw Shaenate use mace on defendant at the 7th Street train station and saw a visible bite mark on defendant's neck. This was not the first time Aaron had seen Shaenate use mace on defendant.

[6]     Defendant attached the police report for this incident to his motion to dismiss the firearm enhancement.

5

nightstand.  Defendant had brought two burritos to the room; defendant shared his with Aaron and gave the second burrito to Shaenate.

Defendant and Shaenate began to argue over various things.  Defendant accused Shaenate of taking some of his missing money, and she in turn accused him of infidelity.  At some point while they were arguing, defendant moved the gun from the table to his waistband.  Shaenate ripped open her burrito and asked defendant, "Are you trying to poison me?  You trying to put drugs in me?"  Defendant and Aaron "just laughed" at the comments by Shaenate because she "seem[ed] off."  Aaron told Shaenate to calm down and sober up, but she dismissed him and continued to argue with defendant.  At one point, Shaenate, who had been sitting on the bed, got up and began hitting defendant with her wrists and "throwing herself at him," which "caught [defendant] by surprise."  She was also "kicking and screaming" and "tr[ied] to bite" him.  Defendant was trying to "reason and talk with her" to "deescalate the situation."

Shaenate would not listen to reason, was saying "personal stuff" and threatened to "badly hurt [defendant]."  While hitting defendant with her wrists, Shaenate was forcing defendant toward the bathroom door.  While pinned in the corner, defendant took the gun from his waistband.  With the gun in his hand, defendant held Shaenate back with his fist to her chest and repeatedly told Shaenate to "get off [him]."  Shaenate continued to insult defendant even though he had the gun in his hand.  Defendant started playing with the gun: he cocked the gun back and kept taking bullets out of the clip and putting it back in empty and was flicking the safety up and down.  Defendant told Aaron, "Pack your stuff.  I'm about to blow this bitch" or "I'm

6

about to pop this B[itch]."[7]  Aaron understood this to mean defendant did not want Aaron involved in a personal dispute and did not believe defendant was being serious or literal.

Shaenate retreated and began to walk around the room, going back and forth between the bed and the bathroom.  During this period, things calmed down, and defendant placed the gun on the nightstand or a desk.

With the situation calm, Shaenate sat on the bed, leaning back on the headboard.  Shaenate then threw her burrito at defendant.  Defendant picked up the gun and said, "I'll do it.  I'll do it for real.  I'll do it."  The next thing Aaron remembered, "the gun go[es] off" about five seconds after Shaenate threw the burrito.  Aaron summarized the situation, saying, "[Shaenate] keeps on talking mess to Detroit, and sooner or later the gun goes off when he's messing around with her, and he accidentally shot her in the head."  Aaron did not see defendant fire the gun because he was looking at Shaenate; he saw the bullet strike her in her face.

After the shooting, Harmonnie, who had been sitting in a corner the entire time with her headphones on, ran out of the room.  Aaron called 911, but the operator "thought [he] was joking" and he hung up.  Aaron told defendant to grab his stuff, and the two left.  Surveillance video from the hotel showed three people leaving the hotel room at approximately 10:15 p.m. on January 5.  Defendant and Aaron caught a train to Lancaster, and two days later they went their separate ways.

---

[7]  When asked about his statement to police that defendant said he was going to "kill this bitch," Aaron maintained defendant said "blow" not "kill" and testified if he told police otherwise, he "was wrongly mistaken."

7

**D.**   *Discovery of Shaenate and police investigation*

On January 6, 2023, Jiangbo Zhang, a hotel employee, was asked to check the room that had been occupied by defendant and his group. The door was ajar, and after receiving no response to repeated calls and knocks, Zhang entered and found a woman lying on the bed with blood on the sheets. He immediately called 911.

LAPD Officer Derek De Buck responded to the scene and saw a deceased woman on the bed with a partially eaten burrito in her right hand. De Buck recovered a spent .40-caliber Smith and Wesson cartridge casing from the nightstand.

Defendant was arrested in Pasadena on January 7, 2023. Pasadena Police Department Detective Ryan McInnis searched defendant's backpack and found a loaded firearm. The .40-caliber semiautomatic handgun, its magazine, and the .40-caliber round inside the chamber were booked into evidence and turned over to LAPD Detective Hector Salas.

On January 11, 2023, Detective Salas met with Aaron at the police station. The interview was video-recorded and played for the jury. During the interview, Aaron told a different version of events. Aaron stated that defendant had accused Shaenate of messing with his food and taking his money, while Shaenate "was trying to keep things chill." Aaron also stated when they first entered the hotel room, defendant took his gun from his backpack and placed it on the nightstand; 15 minutes later defendant retrieved the gun, began to yell at Shaenate, and kept "putting it down, picking it up, reloading it, clocking [*sic*] it back" for "a good amount of time"; and defendant said, "You guys better pack your shit because I'm about to kill this bitch." Aaron did not mention during the interview that Shaenate had thrown the burrito at defendant or struck him at any point during the incident.

8

### E. *Autopsy and forensic evidence*

Deputy medical examiner Dr. Kevin Young performed an autopsy on Shaenate on January 11, 2023. She had a single gunshot wound to the head and a bullet lodged in her upper right back. The manner of death was homicide, and the cause of death was the gunshot wound to the head; the specific mechanism of death was "[p]robably hemorrhage through the carotid artery." Dr. Young could not be sure about the distance from which the gun was fired.

Criminalist Daniel Rubin examined the firearm and determined it was fully functional. The gun had multiple safety features: a thumb safety lever that had to be pushed down for the gun to fire, a requirement that the gun be fully cocked, and a firing pin block designed to prevent accidental discharge if dropped. Testing confirmed the cartridge casing recovered from the hotel room had been fired from defendant's firearm.

### F. *Stipulation*

The parties stipulated that, on January 11, 2023, defendant suffered a conviction for misdemeanor willful infliction of corporal injury on a cohabitant or intimate partner (§ 273.5, subd. (a)).

## DISCUSSION

### I. CALJIC No. 8.11 is a proper statement of the law regarding implied malice

Defendant contends the court erred in failing to instruct the jury "that a defendant acts with implied malice only if his conduct carries a high probability of death." (Capitalization omitted.) Specifically, relying on *People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*), defendant argues the jury should have been instructed that, "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some

9

vague or speculative sense; it must involve[] a high degree of probability that it will result in death." Thus, because the court "omit[ted] or misstate[d] an essential element" and his jury was not instructed that "dangerous to human life" does not necessarily mean something that carries a "high degree of probability that it would result in death," defendant's rights were violated and his conviction must be reversed. Respondent contends defendant has forfeited this claim by failing to object in the trial court, and, in any event, there was no error in the instruction as given to the jury. We decline to address the forfeiture question because the claim fails on the merits.

### A. *Applicable law and standard of review*

"In reviewing a challenge to jury instructions, we must consider the instructions as a whole." (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1294.) "'"A claim of instructional error is reviewed de novo."'" (*People v. Howard* (2024) 104 Cal.App.5th 625, 661.)

"California law separates criminal homicide into two classes: the greater offense of murder and the lesser offense of manslaughter. [Citation.] Murder is defined as 'the unlawful killing of a human being … with malice aforethought' (§ 187, subd. (a)), while manslaughter is defined as 'the unlawful killing of a human being without malice' (§ 192)." (*People v. Schuller* (2023) 15 Cal.5th 237, 252 (*Schuller*).)

"[M]alice may be express or implied. [¶] [It] is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188.) "Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another

10

and who acts with conscious disregard for life.""'" (*Reyes, supra*, 14 Cal.5th at p. 988, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)

**B.** *Analysis*

Here, using CALJIC No. 8.11, the trial court instructed the jury regarding implied malice as follows: "Malice is implied when: [¶] 1. The killing resulted from an intentional act; [¶] 2. The natural consequences of the act are *dangerous to human life*; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (Italics added.) Defendant asserts the *Reyes* decision, "implicitly repudiated the then existing version of CALCRIM Number 520," which is essentially the same instruction as CALJIC No. 8.11 given in this case. We disagree.

In 2023, the California Supreme Court reaffirmed the definition of implied malice as it has been explained in its past jurisprudence. (*Reyes, supra*, 14 Cal.5th at pp. 988–989; see *Knoller, supra*, 41 Cal.4th at p. 152 ["dangerous to life" and "'a high degree of probability that [the act] will result in death'" mean the same thing]; see also *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111 [the two definitions embody the same standard & held the implied malice instruction "correctly distills the applicable case law"]; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1221 (*Dellinger*) [same]; *People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*) [same].) Thus, nothing in the *Reyes* decision has rendered the implied malice instruction as given in CALJIC No. 8.11, or the former version of CALCRIM No. 520, incorrect.[8]

---

[8] After the *Reyes* decision, CALCRIM No. 520 was revised. The modified instruction added language that clarifies, "[a]n (act/[or] failure to act) is *dangerous to human life* if it involved a

11

In *Reyes*, the Supreme Court reiterated its previous definition of the required objective mens rea for implied malice; specifically, "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must "'involve[] a high degree of probability that it will result in death.'"" (*Reyes, supra*, 14 Cal.5th at p. 989, quoting *Knoller, supra*, 41 Cal.4th at p. 152.)

Defendant acknowledges *Reyes* "did not expressly overrule" its prior holdings in *Watson* and *Dellinger* but argues the analysis in *Reyes* "directly refuted their view that the phrase 'dangerous to life' adequately encapsulates the actus reus component of implied malice murder." Specifically, he argues the phrase "conduct carrying a high probability of death" conveys that "the probability of death from the act must be more than remote or merely possible." Defendant avers, as a result, the court "omit[ted] or misstate[d] an essential element of [the] offense." Not so. As the *Reyes* court reiterated, "under the objective component of implied malice, ""dangerous to life"" means the same thing as a "'high degree of probability that'" the act in question "'will result in death.'"" (*Reyes, supra*, 14 Cal.5th at p. 989, quoting *Knoller, supra*, 41 Cal.4th at p. 152.) If they mean the same thing, nothing was omitted or misstated.

The specific context of *Reyes* also works against defendant. *Reyes* did not involve jury instructions administered at trial or determination of liability for an actual killer. Rather, *Reyes* involved determining aider and abettor liability during a

---

high degree of probability that it would result in death." (CALCRIM No. 520 (Rev. Mar. 2024).) To date, the corresponding instruction, CALJIC No. 8.11, used in this case has not been so modified.

12

resentencing hearing held pursuant to section 1172.6. (*Reyes, supra*, 14 Cal.5th at p. 984.) In so doing, the court found "Reyes's acts of bicycling into rival territory and chasing after [the victim]'s car with [the actual shooter] and other fellow gang members were too attenuated in the chain of events to have proximately caused the killing; any causal link between Reyes's conduct and [the victim]'s death [wa]s tenuous at best." (*Id.* at p. 989.)

Defendant appears to argue, even if his act was dangerous to human life, it does not necessarily follow that the jury would have found the act involved a high degree of probability that it would result in death. This argument is unavailing. Defendant was not an aider and abettor; he was the actual killer. He did not act as back up while riding into rival gang territory; he pointed a gun directly at the victim's face and fired. (See *People v. Collins* (2025) 17 Cal.5th 293, 311 ["'"In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act."'"].) His actions were not tenuously connected to Shaenate's death and were without question dangerous to human life such that they "involved a '"high degree of probability that [they would] result in death."'" (*Id.* at p. 321.) Thus, even assuming the language used in *Reyes* better articulates the implied malice standard for the jury, the trial court did not err in giving the jury a legally correct instruction. Moreover, because our Supreme Court did not overrule or disapprove of its prior cases (and instead referred to them approvingly), we find "the instruction under [CALJIC No. 8.11] remains a correct statement of law, notwithstanding any clarification in *Reyes*." (*People v. Pierce* (2025) 114 Cal.App.5th 508, 536.)

13

## II. Substantial evidence did not support giving an instruction on involuntary manslaughter

Defendant claims the trial court erred by failing to sua sponte give lesser-included offense instructions regarding involuntary manslaughter. Specifically, defendant argues the evidence was sufficient to support a finding that he accidentally shot Shaenate while brandishing a weapon. Respondent asserts the court has no duty to instruct on involuntary manslaughter because "Shaenate's death was the probable consequence naturally flowing from [defendant's] act of pointing the gun directly at her and pulling the trigger, not merely exhibiting or using the gun." We agree with respondent.

### A. *Applicable law*

#### 1. *Standard of review*

"We review a claim of instructional error de novo. [Citation.] In doing so, we view the evidence in the light most favorable to the defendant." (*People v. Mirabal* (2025) 115 Cal.App.5th 708, 727.)

#### 2. *Duty to instruct*

"'A trial court has a sua sponte duty to "instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case"'" (*People v. Mitchell* (2019) 7 Cal.5th 561, 586), including "'on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*), disapproved on another ground by *Schuller, supra*, 15 Cal.5th at p. 260). "[I]nsofar as the duty to instruct applies regardless of the parties' requests or objections, it prevents the 'strategy, ignorance, or mistakes' of *either* party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourages

14

'a verdict … no harsher *or more lenient* than the evidence merits' [citation], and thus protects the jury's 'truth-ascertainment function' [citation]." (*Id.* at p. 155.)

"However, we have never intimated that the rule is satisfied once the jury has *some* lesser offense option, so that the court may limit its sua sponte instructions to those offenses or theories which seem strongest on the evidence, or on which the parties have openly relied. On the contrary, as we have expressly indicated, the rule seeks the most accurate possible judgment by 'ensur[ing] that the jury will consider the *full range of possible verdicts*' included in the charge, regardless of the parties' wishes or tactics. [Citation.] The inference is that *every* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*Breverman, supra*, 19 Cal.4th at p. 155.)

On the other hand, "a court's obligation to instruct on a lesser included offense does not arise 'whenever *any* evidence, no matter how weak, is presented to support an instruction, but only when the evidence is substantial enough to merit consideration by the jury.' [Citations.] In this context, "'[s]ubstantial evidence is … evidence that a reasonable jury could find persuasive.'"" (*People v. Sevilla* (2025) 115 Cal.App.5th 618, 625.)

### 3. *Involuntary manslaughter*

Involuntary manslaughter is the unlawful killing of a human being without malice in "the commission of an unlawful act, not amounting to a felony" or "the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection" (§ 192, subd. (b)), essentially acting with criminal negligence. Like voluntary manslaughter, involuntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

15

"The misdemeanor of brandishing a weapon is committed when a person draws or exhibits a firearm, in the presence of another person, 'in a rude, angry, or threatening manner.' (§ 417, subd. (a)(2).)" (*People v. Thomas, supra*, 53 Cal.4th at p. 814.) "Accordingly, an accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter." (*Ibid.*) Where substantial evidence supports it, an instruction on involuntary manslaughter is required. (*People v. Rogers* (2006) 39 Cal.4th 826, 884.)

### B. *Analysis*

Defendant acknowledges defense counsel did not request an involuntary manslaughter instruction at trial and that such a theory was never discussed. Nonetheless, he argues the court had a sua sponte duty to instruct regarding involuntary manslaughter because substantial evidence supported such an instruction. Specifically, defendant points to Aaron's testimony that defendant "brandish[ed] a firearm just prior to an accidental shooting" because he "pulled out a firearm that he placed in his waistband and later on a table in the hotel room," he "took the clip out and put it back into the gun, empty, and he clicked the safety up and down," and "Aaron testified that the gun fired 'when he's messing around with her, and he accidentally shot her in the head.'" Defendant points to *People v. Lee* (1999) 20 Cal.4th 47 (*Lee*) to support his claim. *Lee* is distinguishable.

In *Lee*, the defendant was extremely drunk—registering a blood alcohol content of 0.26 percent after the shooting—and was "staggering," and "unable to stand." (*Lee, supra*, 20 Cal.4th at p. 53.) He and his wife began "arguing and pushing each other," Lee went to retrieve his handgun and "the couple continued to push each other with the gun between them." (*Ibid.*) Moments

16

later the shot was fired; defendant held his wife on the floor and "begg[ed] her not to die." (*Ibid.*)

Here, defendant and Shaenate had been arguing leading up to the shooting. Shaenate threw pieces of her burrito at defendant and accused him of trying to poison her. At one point, earlier in the argument, Shaenate got up and began hitting defendant, and defendant tried to "deescalate the situation." Shaenate continued to insult defendant even though he had the gun in his hand. With the gun in his hand, defendant told Aaron, "Pack your stuff. I'm about to blow this bitch" or "I'm about to pop this B[itch]." After about 15 minutes of this back and forth between defendant and Shaenate, things calmed down, defendant put the gun back on the nightstand, and Shaenate sat back on the bed.

According to Aaron, Shaenate then threw her burrito at defendant. Defendant picked the gun back up and said, "I'll do it. I'll do it for real. I'll do it" and, seconds later, defendant shot Shaenate in the face. The medical examiner was not able to estimate the exact distance defendant was standing from Shaenate at the time of the shooting but was able to ascertain it was "likely a distant range wound"—at least more than three to four feet—because there was no "soot [or] stippling" on Shaenate's body. Shaenate was found by police lying on the bed with a half-eaten burrito in her hand.

Unlike *Lee*, there is no evidence defendant and Shaenate were physically scuffling or touching in any way at the time defendant shot Shaenate. Instead, the evidence established the shooting took place while the two were some distance away from each other and defendant said, "I'll do it. I'll do it for real." Moreover, the evidence suggests defendant was contemplating shooting Shaenate throughout their argument. In the time

17

leading up to the shooting, defendant put the gun in his waistband, took the gun out of his waistband, cocked it, unloaded it, reloaded it, and fiddled with the safety before putting it back on the table when things calmed down.  There was no evidence, let alone substantial evidence, to support the theory that the gun was discharged accidentally.

Even if we were to assume otherwise, any error was harmless.  "The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.'  [Citation.]  'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Thomas, supra,* 53 Cal.4th at p. 814, fn. omitted.)

Here, the evidence supporting the jury's finding of second degree murder was overwhelming.  The only evidence the shooting was accidental, Aaron's testimony that defendant "accidentally shot her in the head," came from a witness who was not even looking at defendant at the time of the shooting.  Therefore, "[t]hese circumstances strongly support a conclusion that the shooting was not accidental," and there is no reasonable probability the jury would have reached a different result if the instruction had been given.  (*People v. Thomas, supra*, 53 Cal.4th at p. 814.)

**III. The prosecutor's explanations of provocation and the cooling period were not objectionable, and if they were, defendant was not prejudiced by counsel's failure to object**

Defendant contends defense counsel was ineffective in failing to object to the prosecutor's arguments regarding heat of passion and past provocative acts during closing argument. Specifically, defendant argues "the prosecutor erroneously argued if [defendant] was making conscious decisions, he was not acting in the heat of passion," and "the prosecutor misled the jury by arguing it could not consider past provocative acts if there was a cooling period between those acts and the act that ultimately led the defendant to kill." We disagree.

**A.** *Relevant proceedings*

Relevant here, the jury was instructed regarding voluntary manslaughter, using CALJIC No. 8.40; heat of passion and provocation, using CALJIC No. 8.42; and cooling period, using CALJIC No. 8.43.

CALJIC No. 8.42 explained, to reduce murder to manslaughter, "the provocation must be of the character and degree as naturally would excite and arouse the passion, and the assailant must act under the influence of that sudden quarrel or heat of passion." The instruction explained the passion must be of a sort as would be "aroused in the mind of an ordinarily reasonable person in the same circumstances" and the "provocation may occur in a short, or over a considerable, period of time." The jury was told they must also determine whether "defendant was in fact provoked" and the provocation must have been caused by the victim. In short, the jury was instructed to determine whether "the reason of [defendant] was obscured or disturbed by passion to such an extent as would cause the

19

ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection."

Using CALJIC No. 8.43, the jury was also instructed defendant must have killed "while [he] was acting under the direct and immediate influence of the quarrel or heat of passion" and where "sufficient time has elapsed for angry passion to end and for reason to control his conduct, it will no longer excuse express or implied malice." Ultimately, the jury was to determine "whether the cooling period has elapsed and reason has returned" by looking at "the time it would take the average or ordinarily reasonable person to have cooled the passion, and for that person's reason to have returned."

During closing argument, the prosecutor primarily argued her view defendant committed first degree premeditated murder. In explaining provocation, the prosecutor said, "[y]ou can use the evidence about provocation in two different ways": to either reduce the first degree murder to second degree or reduce second degree murder to voluntary manslaughter. Regarding voluntary manslaughter, the prosecutor explained first, there must be "some sort of provocative act … something that triggers that heat of passion" and "defendant is actually acting under the 'heat of passion,'" and, second, "the provocation [is] such that a reasonable person would act from passion rather than judgment."

The prosecutor went on to explain heat of passion: "So if a defendant is making conscious choices, then their judgment is not obscured because they are able to make decisions. What passion we are talking about here is a passion that obscures all reason and judgment, all reasoning and conscious decision-making is going out the window and that passion in response to a provocative act has to be such that a reasonable person would react the same way. Not necessarily that a reasonable person

20

would also kill, because the jury instruction is specific and I want you to take note of that. It's that a reasonable person would act from that passion and not out of any conscious decision-making." The prosecutor noted, "It's canceling out express malice or implied malice because the person is acting in such a way that they have no judgment in decision-making ability anymore," and that feeling was "sufficient that a reasonable person would be … unable to control themselves."

She described it as "passion … versus judgment." The passion defendant felt is such that, "Are they acting with conscious decision-making or are they acting without any reason[?] They are seeing red, et cetera." Finally, the prosecutor emphasized the importance of CALJIC No. 8.42 "because it talks a lot about what that passion is."

Next, the prosecutor explained CALJIC No. 8.43 and the cooling period. She explained, "there's no specific measure to that time. It could be 10 seconds. It could be five minutes. It could be six hours. It could be 10 weeks. It's just specific to the evaluation of the evidence in this case.… It just has to be sufficient time for reason to have returned to the person." Further, she noted, "It's measured by a reasonable person standard.… It is how much time would a reasonable person need to cool off from what has happened[?]"

The prosecutor discussed the evidence of the prior incidents between defendant and Shaenate and noted their relevance in evaluating whether defendant was provoked, but also argued that "there's a big cooling off period between all of them[,] [e]ven between the incident that occurred on December 26 and the actual murder on [January] fifth," and "if there is a break in that chain, that's not provocation anymore." The prosecutor also argued there was a "break" during the events on evening of

21

January 5, 2023, when "[t]hings calmed down" during the incident. She reiterated, "for the reasons we've talked about as a matter of law, if you determine that those cooling periods are sufficient that doesn't count as the provocative act."

Finally, the prosecutor reminded the jury, "if you think that anything about what I present … or … argue is incorrect or contrary to the jury instructions, you have to follow the instruction."

During his closing, defense counsel noted he "fundamentally disagree[d]" with the People's "description of the … law of heat of passion and sudden quarrel." Pointing to the People's burden, counsel argued, "It's on them to prove that there's no way that [defendant] was obscured by passion, by emotion."

Discussing provocation and the cooling period, defense counsel listed the various things Shaenate had done to provoke defendant in the recent past. Counsel explained the question was whether a reasonable person would "act rashly and from passion, rather than from judgment." Counsel offered, "[l]egally adequate provocation may occur in a short or over a period of considerable time," and argued, Shaenate's "act[s] of aggression" toward defendant were the "million straws underneath" the thrown burrito that eventually broke the camel's back.

Defense counsel further discussed his disagreement with the prosecutor, saying, "This is not an unconsciousness defense," but agreed with the People's characterization of heat of passion as "going red." Counsel posited, "sometimes when we are in those intimate relationships we just can't take it anymore. That's the emotion." He compared the level of emotion and consciousness to driving while dealing with extreme emotions: "[W]hen that feeling just overcomes our emotions and, yes, we are driving….

22

I'm still stopping[,] still picking up my kids. But I'm not [mentally] here…. My mind is pre-occupied…. That is the emotion we are talking about. It's not an unconsciousness. It's the emotion that you can act rashly" and "obscures your reason."

In rebuttal, the prosecutor reemphasized the importance of CALJIC No. 8.43 and the cooling period. She said, "That is why the cooling period instruction is so very important because you … are the ones who decide whether you view that provocation collectively as one thing—the way [defense counsel] has described—or whether in applying the cooling period instruction, there was sufficient cooling off time in between what is going on prior to the date of the murder and on the date of."

## B.   *Applicable Law*

### 1.   *Heat of passion and cooling period*

To establish heat of passion and provocation, the evidence must show "defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481.)

Regarding the cooling period, CALJIC No. 8.43 instructs, "To reduce a killing upon a sudden quarrel or heat of passion from murder to voluntary manslaughter, the killing must have occurred while the slayer was acting under the direct and immediate influence of the quarrel or heat of passion. Where the influence of the sudden quarrel or heat of passion has ceased to obscure the mind of the accused, and sufficient time has elapsed for angry passion to end and for reason to control his conduct, it will no longer excuse express or implied malice …. The question,

23

as to whether the cooling period has elapsed and reason has returned, is not measured by the standard of the accused, but the duration of the cooling period is the time it would take the average or ordinarily reasonable person to have cooled the passion, and for that person's reason to have returned."

"'[T]he key element is not the duration of the source of provocation but "'whether or not defendant's reason was, at the time of his act, so disturbed or obscured by some passion … to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'"'" (*People v. Wright, supra,* 242 Cal.App.4th at p. 1487; see *People v. Wharton* (1991) 53 Cal.3d 522 [provocatory conduct could occur over a span of weeks]; *People v. Berry* (1976) 18 Cal.3d 509, 516 [when provocation consisted of a "long course," even 20 hours could be not long enough to cool]; *People v. Borchers* (1958) 50 Cal.2d 321, 329 [heat of passion supported where induced by "long continued provocatory conduct" during a five-month relationship].)

### 2. *Prosecutorial misconduct*

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements." (*People v. Marshall* (1996) 13 Cal.4th 799, 831; see *People v. Bell* (1989) 49 Cal.3d 502, 538.) "To establish such error, bad faith on the prosecutor's part is not required." (*People v. Centeno* (2014) 60 Cal.4th 659, 666.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an

24

improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*Id.* at p. 667.)

### 3. *Ineffective assistance of counsel*

To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below a standard of reasonable competence and that prejudice resulted. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 (*Strickland*); *People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).) "[A] mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772.) Even where a prosecutor's statements constitute misconduct, defense counsel may have sound tactical reasons for not objecting, such as a desire not to highlight the prosecutor's comments for the jury. (*People v. Padilla* (1995) 11 Cal.4th 891, 940 (*Padilla*), overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People v. Lucky* (1988) 45 Cal.3d 259, 293; *People v. Ghent, supra*, at p. 773.) "'The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.'" (*Padilla, supra*, at p. 940.)

### C. *Analysis*

In order to reach defendant's claim of whether counsel was ineffective for failing to object to the prosecutor's arguments, we must determine if the prosecutor's statements were objectionable.[9]

---

[9] Though defendant does not explicitly say so, by virtue of his claim of ineffective assistance of counsel for "failing to object," he tacitly admits the objection was waived. (*People v. Perez* (2018) 4 Cal.5th 421, 451 [failure to object and request a curative

25

**1.** *Heat of passion*

Defendant contends "[t]he prosecutor essentially conflated the defense of unconsciousness with heat of passion" and notes heat of passion does not require defendant to act unconsciously. This, he argues, "undermined the prosecution's burden of proof." We conclude there was no misconduct on the part of the prosecutor. Even assuming otherwise, defense counsel was not deficient in failing to object.

Though counsel referred to "conscious decision-making … going out the window," she also discussed "seeing red" and "passion that obscures all reason and judgment." While some of the prosecutor's statements regarding heat of passion could be described as imprecise, they were not objectionable and "fall[] within the prosecutor's wide latitude to comment on the evidence during closing argument." (*People v. Peoples* (2016) 62 Cal.4th 718, 797 (*Peoples*).) To the extent her explanations could have been misunderstood by the jury, the prosecutor repeatedly reminded the jury of the importance of the jury instructions and reminded them, "if you think that anything about what I present … or … argue is incorrect or contrary to the jury instructions, you have to follow the instruction." Thus, when viewing the argument as a whole, alongside the instructions, defendant has not demonstrated "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*Centeno, supra*, 60 Cal.4th at p. 667.)

Furthermore, defense counsel was not deficient in failing to object to the prosecutor's argument regarding heat of passion. Rather, defense counsel opted to address any imprecision on the

---

instruction, results in forfeiture of the claim of prosecutorial misconduct].) We accept defendant's admission.

26

part of the prosecutor head on.  Specifically, counsel clearly and directly told the jury he "fundamentally disagree[d]" with the People's characterization of heat of passion and provocation and explained his view of the concepts.  Defense counsel's decision not to object was a reasonable tactical choice; he chose instead to address the prosecutor's framing of the issue directly, expressly telling the jury he disagreed with her characterization.  We will not second-guess that choice.  (*Padilla, supra*, 11 Cal.4th 940.)

### 2. *Cooling period*

Turning to defendant's contention "the prosecutor misled the jury by arguing it could not consider past provocative acts if there was a cooling period between those acts and the act that ultimately led the defendant to kill," we find no error.  First, the prosecutor discussed CALJIC No. 8.43 with the jury and correctly explained the cooling period is measured using a reasonable person standard, has no fixed duration, and is ultimately for the jury to decide.  Next, she argued her *view* that the intervals between defendant and Shaenate's disputes, including the period during which things calmed down on the night of the shooting, were sufficient for a reasonable person to have cooled for purposes of heat of passion.  Finally, to illustrate the point, she offered various time periods spanning from "10 seconds" to "10 weeks."  The prosecutor did not tell the jury it could not consider the prior incidents; she argued the "cooling period br[oke] that chain" and "sufficient time ha[d] elapsed for angry passion to end."  This is a permissible application of the law to the facts, not a misstatement of it.  (See *Peoples, supra*, 62 Cal.4th at p. 797.)

Assuming, for the sake of argument, counsel was ineffective for failing to object to the prosecutor's arguments, we find no prejudice.  The trial court instructed the jury, correctly and at length, on the intricacies of the law of homicide in general and on

27

the points at issue in particular. "The court's instructions, not the prosecution's argument, are determinative, for 'We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*People v. Mayfield* (1993) 5 Cal.4th 142, 179.) Furthermore, the court specifically told jurors, "You must accept and follow the law as I state it to you, regardless of whether you agree with it. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." It also told them the "[s]tatements made by the attorneys during the trial are not evidence."

The court informed jurors that they would have the written instructions in the jury room for reference during deliberations, and to "[c]onsider the instructions as a whole and each in light of all the others." The jurors' extensive marking on the written instruction during deliberations, coupled with their verdict of second degree, rather than first degree murder, demonstrates they took the court's instructions to heart and carefully weighed the evidence of heat of passion, provocation, and the cooling period. Accordingly, based on the evidence elicited at trial, the arguments of counsel, and the full reading of the jury instructions, we presume the jury properly understood its charge and followed the court's instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Defendant points to nothing in the record that rebuts this presumption. (See *People v. Medina* (1995) 11 Cal.4th 694, 760.)

28

## IV. Defendant was not prejudiced by counsel's failure to object to the court's hearsay ruling

Defendant contends he was "denied his right to counsel under the Sixth and Fourteenth Amendments by defense counsel's failure to object to the trial court's ruling that [his] statement immediately following the shooting was hearsay" (boldface and capitalization omitted) where it was admissible as an excited utterance pursuant to Evidence Code section 1240 and he was prejudiced because it "strongly suggested that the killing was accidental." We find no prejudice.

### A. *Relevant facts*

Before trial, the People made an unopposed motion "that the defense not introduce the defendant's own statements." During his testimony, Aaron stated that immediately following the shooting, defendant "looked at [him] and said, I'm sorry. It was an accident. I didn't know the safety was off." The People objected to the statement as hearsay. The court sustained the objection and struck the "[s]tatement as to what the defendant said." There was no objection by defense counsel.

### B. *Applicable law*

As discussed, to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below a standard of reasonable competence and that prejudice resulted. (*Strickland, supra*, 466 U.S. at pp. 687–688; *Anderson, supra*, 25 Cal.4th at p. 569.) Prejudice is shown where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, at p. 694; see *Anderson, supra*, at p. 569.)

29

C.    *Analysis*

Here, we need not decide if counsel was deficient for failing to advance the admissibility of defendant's statement to Aaron because, even assuming deficiency, defendant has not established he was prejudiced by the statement's exclusion.  (See *Strickland, supra*, 466 U.S. at pp. 687 ["the defendant must show that the deficient performance prejudiced the defense"], 697 [a court need not "address both components of the inquiry if the defendant makes an insufficient showing on one"].)

Defendant contends he was prejudiced because the omitted statement "strongly suggested that the killing was accidental" and the "statement would have bolstered Aaron's testimony on direct examination that the gun fired 'when [defendant was] messing around with her, and he accidentally shot her in the head.'"  Thus, the statement would have "demonstrated that [defendant] did not have an intent to kill and negated malice." We disagree.

First, though the statement would have corroborated Aaron's testimony that defendant was "messing around with her" and in his opinion "accidentally shot her in the head," the statement directly contradicted defendant's heat of passion defense.  Heat of passion concedes an intentional killing but denies malice.  Introducing a statement from defendant that the killing was accidental, with no other evidence to support that theory, would have left defense counsel in the position of needing to either abandon the primary defense or ask the jury to simultaneously consider and credit two irreconcilable accounts of the same event.  There is no reasonable probability this would have produced a more favorable result; indeed, it is more likely to have damaged the defense overall.

Second, even assuming the statement had been admitted under Evidence Code section 1240, the jury's probable assessment of it must be considered. (See *Strickland, supra*, 466 U.S. at pp. 695–696 [the court must assess the probable impact of the evidence on the jury's deliberations in light of the entire record].) The statement came through the testimony of a 16-year-old witness who regarded the much older defendant as a "brother." The statement was never disclosed to the police prior to trial and would have been subject to substantial impeachment. Aaron's obvious loyalty to defendant would have undermined the statement's credibility, and the late disclosure would have invited the jury to view the statement as a recent fabrication to help his "brother."

Third, there was no substantial evidence to support a theory the shooting was an accident or Aaron's testimony that the two were "on the bed[, a]nd next thing I know she keeps on talking mess to [defendant], and sooner or later the gun goes off when he's messing around with her, and he accidentally shot her in the head." Instead, the evidence established (1) the shooting took place while defendant stood some feet away from Shaenate, not while the two were involved in a tussle; (2) defendant told Aaron to leave because he was going to kill or "pop" Shaenate; (3) defendant picked the gun up and said he would "do it for real"; (4) defendant shot Shaenate after she threw her burrito at him, which also established the shot was fired from some distance away; and (5) defendant fled from the hotel room following the shooting, rather than calling the police to report an accidental shooting. Thus, the only evidence supporting a theory of accidental shooting would have been Aaron's lay opinion that defendant "accidentally shot her" and the excluded statement

31

itself. The evidence of provocation was far more substantial and a much stronger foundation upon which to build a defense.

Fourth, and finally, the verdict returned by the jury further demonstrates a lack of prejudice. If an accident defense had been advanced and successful, defendant would have been convicted of involuntary manslaughter. The jury convicted defendant of second degree murder, having rejected defendant's heat of passion defense. The inferential leap from "defendant's accident statement comes in" to "the jury returns a verdict of involuntary manslaughter" requires the jury to have credited a theory supported by a single statement from a biased witness with no other evidentiary foundation and, in fact, substantial evidence to the contrary. This leap is speculative at best.

Each of these reasons independently supports a finding of no prejudice. When considering them together, it is not reasonably probable that but for the exclusion of the statement, the result would have been different. (*Strickland, supra*, 44 U.S. at p. 694.)

## V. Trial court did not abuse its discretion in declining to dismiss the firearm enhancement under Senate Bill 81

Defendant alleges the trial court erred in failing to strike his firearm enhancement pursuant to Senate Bill 81. We disagree.

### A. *Relevant facts*

Ahead of sentencing, defense counsel moved to dismiss the section 12022.5, subdivision (a) firearm enhancement pursuant to section 1385, subdivision (c) as amended by Senate Bill No. 81 (2021-2022 Reg. Sess). Counsel asserted two factors in mitigation: (1) defendant suffered from posttraumatic stress disorder (PTSD) and the offense was connected to the disorder

32

and (2) the offense was connected to his prior victimization by Shaenate. He averred dismissal would not endanger public safety because he would receive a sentence of 15 years to life and he would be over 40 years old when he was parole eligible.

In support of defendant's motion, counsel attached a behavioral health assessment (BHA), wherein defendant was diagnosed with "engrained or settled PTSD"; substance abuse disorders for alcohol, opiates, cannabis, and amphetamines; and "depressive disorder, not otherwise specified"; as well as an incident report from December 26, 2022, where defendant (referred to as "Jaheem Brown") and Shaenate had been involved in a domestic violence incident, with Shaenate as the "suspect" and defendant as the victim.

The People filed a sentencing brief wherein they asked the court to sentence defendant to the maximum of 25 years to life—15 years to life for count 1 and 10 years for the firearm enhancement—because defendant's criminal history involves numerous convictions of increasing seriousness as defined by rule 4.421(b)(2). The People noted, if opting for the middle term, the court could also consider defendant's certified records of conviction and "other factors in aggravation" pursuant to rules 4.420(c) and (d). Finally, the People argued the low term was not required pursuant to rule 4.420(e) because defendant was not a youthful offender, and "[t]here [we]re no mitigating factors present in this case that would require the imposition of the low term, because there [wa]s insufficient nexus between Defendant's prior experiences and the instant offense."

The People argued against dismissal of the enhancement because, while defendant advanced the presence of two mitigating factors, the People argued there was no evidence presented providing a clear nexus between the instant offense

33

and defendant's prior victimization or PTSD.  Finally, the People argued the jury rejected defendant's theory that the murder of Shaenate was connected to any "on going abuse he suffered at [her] hands" and "urge[d] the court to make the same finding."

On December 3, 2024, the court held a trial on the three aggravating factors alleged in the information: (1) defendant was armed at the time of the offense as described in rule 4.421(a)(2); (2) the offense involved great violence within the meaning of rule 4.421(a)(1);[10] and (3) defendant has suffered numerous convictions of increasing seriousness within the meaning of 4.421(b)(2).

Ultimately, the court found true beyond a reasonable doubt that defendant suffered numerous convictions as an adult, which were of increasing seriousness.  The court found use of the armed aggravating factor pursuant to rule 4.421(a)(2) for purposes of sentencing on the firearm allegation to be inappropriate and, as a result, it was withdrawn by the People.

At the sentencing hearing, the court considered the parties' arguments on the motion to dismiss the firearm enhancement, listened to victim impact statements, and sentenced defendant. Specifically, Shaenate's mother spoke about the loss of her daughter, and the prosecutor read a statement written by Shaenate's aunt.  Defense counsel reiterated the request to dismiss the gun enhancement or, in the alternative, impose the low term based on the mitigating factors.

The court declined to dismiss the enhancement under section 1385 after "balancing [defendant's] record, which ha[s] numerous convictions of increasing seriousness" and "culminating in this offense" with "the facts and circumstances

---

[10]    This factor was withdrawn by the People.

34

surrounding this [offense] and the evidence of childhood trauma suffered by defendant." The court imposed the midterm for the enhancement, finding "on balance" it "is the appropriate sentence." As a result, defendant was sentenced to 15 years to life on count 1, plus four years for the firearm enhancement.

### B. *Standard of review and applicable law*

We review a trial court's decision whether to dismiss or strike an enhancement under section 1385 for abuse of discretion. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490.) "A trial court may abuse its discretion where 'its decision is so irrational or arbitrary that no reasonable person could agree with it,' 'where the trial court was not "aware of its discretion" to dismiss a sentencing allegation under section 1385, or 'where the court considered impermissible factors in declining to dismiss.'" (*Ibid.*)

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) amended section 1385 to add subdivision (c). (*People v. Coleman* (2024) 98 Cal.App.5th 709, 723.) As amended "[s]ection 1385, subdivision (c)(1) … provides that '[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.' … Section 1385, subdivision (c)(2) provides in pertinent part, 'In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.[11]  Proof of the presence of

---

[11]  As noted, defendant asserts the presence of two applicable mitigating factors: (1) "offense is connected to mental illness" (§ 1385, subd. (c)(2)(D)) and (2) "offense is connected to prior victimization" (§ 1385, subd. (c)(2)(E)).

35

one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.'" (*People v. Walker* (2024) 16 Cal.5th 1024, 1032, italics omitted (*Walker*).)

Thus, "'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' *notwithstanding the applicability of any mitigating factors identified in [section 1385,] subdivision (c)(2).*" (*Walker, supra,* 16 Cal.5th at p. 1033, italics added.) If, on the other hand, "the court does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement. But ultimately, the court must determine whether dismissal is in furtherance of justice." (*Id.* at p. 1036.) Simply put, "absent a danger to public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement *unless the sentencing court finds substantial, [relevant, and] credible evidence of countervailing [aggravating] factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.'"* (*Ibid.*) In exercising its discretion under section 1385, the trial court may consider aggravating factors such as those outlined in rule 4.421 or rule 4.410. (See *Walker, supra,* 16 Cal.5th at p. 1033.)

**C.** *Analysis*

As a threshold matter, in making its ruling, the court did not explicitly find dismissal of the enhancement would endanger public safety. Thus, we analyze the court's ruling with attention to whether the court found the countervailing aggravating factors

36

outweighed the great weight given to the mitigating factors. (*Walker, supra*, 16 Cal.5th at p. 1036.)  We find it did.

Importantly, while the BHA demonstrates defendant was diagnosed with PTSD and describes an abusive relationship with Shaenate, the BHA did not establish a nexus or connection between those circumstances and the murder of Shaenate.  This weighs against a finding that these circumstances were mitigating for purposes of dismissing the enhancement under section 1385, subdivision (c).  Moreover, we note, during trial, the defense offered testimony regarding a December 2022 arrest of Shaenate for a domestic violence incident with defendant.  However, the parties also stipulated defendant suffered a conviction for domestic violence on January 11, 2023, and, while the record does not disclose who the victim in that case was, the evidence at trial established Shaenate was defendant's only girlfriend around that time.[12]

In making its ruling, the court noted its discretion related to sentencing on the gun enhancement.  The court explained it balanced defendant's evidence of "childhood trauma" against his "numerous convictions of increasing seriousness" in deciding that dismissing the enhancement would not further justice.  Furthermore, in discussing defendant's extensive and escalating record, the court noted his record "culminat[ed] in this offense," the murder of Shaenate.  While the court did not expressly mention taking account of defendant's abusive relationship with Shaenate, we understand the court to have included that in its assessment of defendant's "trauma" and, furthermore, given the

---

[12]    As mentioned, the police report from the December 26, 2022 incident states Shaenate and defendant had been in a relationship for a year and a half.

37

evidence of mutual volatility, including defendant's own domestic violence conviction shortly after the murder, the court was entitled to discount this factor in its balancing.

"[W]here a statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order." (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) The court was not required to state any specific words beyond what it said at the sentencing hearing. (See *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1096 [trial court's initial statement and "detailed explanation of its reasoning" at the sentencing hearing demonstrated it "engaged in a holistic balancing with special emphasis on the enumerated mitigating factors"].) Here, the court balanced evidence of defendant's PTSD and relationship trauma against his extensive and escalating record and concluded dismissal would not further justice. That is precisely the balancing contemplated in *Walker,* and defendant has not demonstrated it was irrational or arbitrary. (See *People v. Carmony* (2004) 33 Cal.4th 367, 376–377 [party attacking the judgment must clearly show abuse of discretion].) We find no abuse of discretion.

## VI. Cumulative error

Defendant contends the cumulative effect of the errors alleged was prejudicial and violated his due process. Respondent avers there are "no errors or prejudicial errors to accumulate." (Boldface and capitalization omitted.) We agree.

"'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." [Citation.] When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required.'"

(*People v. Yang* (2021) 67 Cal.App.5th 1, 52.) "The cumulative prejudice doctrine is based on an examination of the 'entire record.'" (*Id.* at p. 53.)

Here, "[w]e have rejected nearly all of defendant's claims of error. Where we [assumed] error, we have determined defendant was not prejudiced. Whether such claims are considered individually or together, we find no prejudicial error …." (*People v. Streeter* (2012) 54 Cal.4th 205, 268.)

## DISPOSITION

The judgment is affirmed.


                                          CHAVEZ, Acting P. J.

We concur:


RICHARDSON, J.


GOORVITCH, J.